UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                             Case No. 12-CR-85

SHONTAY DESSART,

    Defendant.

**DECISION AND ORDER GRANTING MOTION TO SUPPRESS**

      Shontay Dessart is charged in an Indictment with 23 separate counts relating to the fraudulent manufacture and sale of drugs without FDA registration. The case is scheduled for trial on September 24, 2012. Among the evidence the government intends to offer at trial are items seized in the course of two searches conducted at separate locations on or about October 29, 2008. The first was performed at a house in the Village of Reedsville where records indicated Dessart resided. U.S. Customs and Border Protection agents had intercepted two packages believed to contain Human Growth Hormone (HGH), a prescription drug regulated by the FDA. The packages had been mailed from China, a major supplier of generic HGH, to Dessart's Reedsville address. Based upon those shipments and additional evidence obtained in the course of his investigation, Special Agent (SA) Loris Cagnoni of the FDA Office of Criminal Investigations had obtained a search warrant for the Reedsville address. The second search was of an apartment in Appleton, where Dessart had been staying with Erica Lynn Garbielsen, his then girlfriend, now wife. (I will continue to refer to her herein as Ms. Gabrielsen to avoid confusion.) The government contends

that the search of Ms. Gabrielsen's apartment was performed with her consent. Presently before the Court is a motion to suppress evidence obtained as a result of the search of Ms. Gabrielsen's apartment. Mr. Dessart claims that the search of the apartment where he was staying with Ms. Gabrielsen was unlawful because her consent was involuntary and the product of government coercion.

**FACTS**

At an evidentiary hearing held before the Court on September 6, 2012, both SA Cagnoni and Ms. Gabrielsen testified concerning the facts surrounding the consent. SA Cagnoni testified that on the early afternoon of October 29, 2008, he, along with several Manitowoc County law enforcement officers, executed the warrant he had obtained for Dessart's Reedsville residence at 325 Mill Street. The entry by law enforcement followed upon the delivery of one of the packages believed to contain HGH. Manitowoc County law enforcement officers apparently entered first with guns drawn to secure the residence. SA Cagnoni entered shortly thereafter. Present in the home at the time were Dessart and Ms. Gabrielsen, his then girlfriend, who was eight months pregnant.

SA Cagnoni testified that Ms. Gabrielsen was detained and initially handcuffed. At some point approximately 40 minutes after police had entered the house, SA Cagnoni asked Ms. Gabrielsen if she would consent to allow law enforcement to search her apartment where Dessart had been staying and where computers believed to contain evidence of his activities were located. SA Cagnoni testified that Ms. Gabrielson agreed to consent, and proceeded to read and sign the consent to search form he handed her with no hesitation. According to SA Cagnoni, Ms.

2

Gabrielsen appeared indignant, stating that what Dessart was doing was perfectly legal, but her tone was not hostile. She did not ask to speak to anyone before signing, and there was no crying or yelling. On cross-examination, SA Cagnoni testified that Ms. Gabrielsen did express a desire to take a phone call which she was expecting and stated she was allowed to do so. SA Cagnoni testified, however, that the decision to allow her to take the phone call was not tied to her signing the consent for the search of her apartment. SA Cagnoni also testified on redirect that if Ms. Gabrielsen had refused to consent to the search of her apartment, he would have obtained a warrant authorizing the search. None of the other law enforcement officers who were present testified.

Ms. Gabrielsen testified that she was 28 years old at the time of the search and had no history of criminal conduct. She had received a Bachelors of Arts degree in Education from the University of Wisconsin at Milwaukee in 2004, and was in the process of applying for admission to a highly competitive accelerated program at the University of Wisconsin at Oshkosh (UWO) from which she hoped to obtain a Bachelor of Science in Nursing in only a year. Over the past several months she had completed courses at UWO that were prerequisites to the program and had undergone a series of interviews as part of the application process, with the last scheduled to take place that very afternoon by telephone. The anticipated interview, her pregnancy, and the need to call the school Dessart's son attended to let him know they were unable to pick him up so that he could go to his mother's house were the primary matters on her mind after police entered Dessart's home that day.

Ms. Gabrielsen testified that when the police entered, they ordered her and Dessart to get down on the floor face down. Because she was in the later stages of her pregnancy, Ms. Gabrielsen could not lie down and was kneeling instead. She was kicked and told she had to get on the

3

ground.  A female law enforcement officer then straddled her, handcuffed her with her arms behind her back, and led her to an upstairs unheated room.  The female officer told Ms. Gabrielsen that she was going to prison and would have her baby in prison.  Ms. Gabrielsen testified that she told the officers about the need to call the school Dessart's son attended to let him know they were unable to pick him up and her own need to take the phone call she was expecting.  The female officer called the school office and told the person who answered that Dessart would not be picking up his son at school because he was being arrested.

At some point, SA Cagnoni directed that the handcuffs Ms. Gabrielsen was wearing be switched so that her hands were restrained in front rather than in back, stating that "we don't want the baby to arrive now."  Ms. Gabrielsen testified that she explained to SA Cagnoni that she needed to take the phone call that she was expecting.  Less than an hour after police entered the home, but shortly before the time she was scheduled to receive the expected telephone call, Ms. Gabrielsen testified, SA Cagnoni entered the room in which she was being held and said "How about you do something for me, and I'll do something for you."  He then handed her the consent to search form. Because she felt she needed to take the call for her interview, Ms. Gabrielsen testified, she took the form, signed it without reading it, and handed it back to SA Cagnoni.  SA Cagnoni told the female officer to let her take the call when it came through.  Shortly thereafter, the call came through, and Ms. Gabrielsen was allowed to answer.

Ms. Gabrielsen testified that she felt overwhelmed and trapped.  The female officer had frightened her with her threat that she was going to prison.  Ms. Gabrielsen indicated she suffers from depression and anxiety, but the driving force in her decision to sign the consent form was her need to take the phone call and preserve her chance to be admitted to the program at the UWO.

4

Law enforcement continued with the search of the house until after dark, according to Ms. Gabrielsen. When she was allowed to return downstairs, she saw that Dessart had been released from his handcuffs, and his father and brother were there. The police officers were eating pizza.

Based on the foregoing evidence, the government argues that Ms. Gabrielsen's consent to search her apartment was voluntary. In the alternative, if Ms. Gabrielsen's consent was not voluntary, the government argues that the search of her apartment should be upheld under the inevitable discovery doctrine. The government notes that at the time he requested Ms. Gabrielsen's consent, SA Cagnoni had probable cause to search her apartment. Given his testimony that had she refused, he would have proceeded to obtain a warrant, the government argues the search would have proceeded in any event and the same evidence would have been seized. The defense, on the other hand, argues that Ms. Gabrielsen's consent was not voluntary and the evidence taken from her apartment must be suppressed.

**ANALYSIS**

"While the Fourth Amendment protects against unreasonable searches and seizures, warrantless searches are not per se unreasonable and are constitutional under the Fourth Amendment if an authorized individual voluntarily consents to the search." *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005) (internal quotes omitted). Because consent to search is an exception to the requirement of a warrant, the Government bears the burden of proving voluntary consent by a preponderance of the evidence. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). The question of whether consent is voluntary is a question of fact that is to be determined from a totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227

5

(1973)("The question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.") In determining whether consent is voluntary, the Court should consider a number of factors, including:

> The age, education and intelligence of the person who allegedly gave consent; whether they were advised of their rights; how long the person was detained prior to the consent; whether there were repeated requests for consent, physical coercion, if any, and whether the individual was in custody.

*United States v. Kozinski*, 16 F.3d 795, 810 (7th Cir. 1994). In order for a waiver or consent to be found involuntary, there also must be a finding of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

From the evidence presented at the hearing on Dessart's motion, I am unable to determine from a preponderance of the evidence that Ms. Gabrielsen's consent was voluntary. I found Ms. Gabrielsen to be a credible witness, and if her testimony is believed, her consent was not voluntary, but was the product of coercive tactics. Generally, a person who is otherwise unwilling to give law enforcement officers consent to search his or her home would not provide such consent just so he or she could receive a phone call. But the undisputed testimony was that Ms. Gabrielsen was under a great deal of stress and this was a very important call she was expecting. The call was to be a telephone interview, the last in a series of interviews she had undergone as part of the admissions process for what she described as a highly competitive accelerated program which would allow her to obtain a bachelor of science degree in nursing in one year. Ms. Gabrielsen testified that she had been enrolled at UWO so that she could takes courses that were prerequisites for the program, and

6

had also gotten a job as a nursing assistant to improve her chances for acceptance. She repeatedly testified, "I needed to take that phone call."

If, as Ms. Gabrielsen testified, SA Cagnoni approached her under these circumstances and essentially offered to allow her to take the call if she signed the consent form, I would find the consent involuntary and coerced. Regardless of whether it would have been permissible for law enforcement to simply prohibit her from taking the call while they were conducting the search, to condition their permission for her to take the call upon her consent to search would have been improper and coercive. To insist that she consent to the search of her home in order to be allowed to take a phone call which she appears to have viewed as essential to the accomplishment of her long-term goal and aspiration would have robbed her consent of the voluntary character required for its validity. This is especially true when considered in light of the surrounding circumstances. Police with guns drawn had entered Dessart's house and ordered the two of them to the floor. Ms. Garbrielsen, who was eight months pregnant at the time, could not lie on her stomach as she was ordered, and was kicked and then straddled by an officer who handcuffed her with her hand behind her. She was then taken to an unheated room upstairs away from Dessart and told she was under arrest, going to prison and might not be able to see her child after she gave birth. Given these circumstances, taken together with her history of depression and anxiety, I cannot find that Ms. Gabrielsen's consent was voluntary.

To be sure, there are reasons to question Ms. Gabrielsen's version of events. Several questions arise. If, as she testified, she was frightened by the female officer's statements that she was going to prison and would not see her child, why was the phone call and the nursing program so important? Frankly, missing a phone call, even this one, would have seemed the least of her

7

problems. Couldn't she have later explained to the school that an unforeseen emergency had arisen if she had missed the phone call? If she really didn't want to consent, why not withdraw her consent after she completed the call? Even with these concerns, however, I find Ms. Gabrielsen to be a credible witness. While the female officer's statements about going to prison may have frightened her, she may not have actually believed them, and the interview upon which she felt so much depended was imminent. Given the highly competitive nature of the program, Ms. Gabrielsen testified she was uncertain that any explanation for not taking the call would suffice. And perhaps she didn't know she could withdraw her consent. There is no evidence that anyone told her she could. It is also true that Ms. Gabrielsen was well educated and seemed intelligent, but she had no prior experience with criminal law, and given all of the surrounding circumstances, it would not be surprising if her actions and beliefs were less than fully rational. Finally, I found her demeanor and manner in testifying on the whole credible.

The greatest obstacle to accepting Ms. Gabrielsen's testimony was the testimony of SA Cagnoni. He also seemed a credible witness, having served as a Special Agent with the FDA's Office of Criminal Investigations for eleven years and for two years with the Drug Enforcement Administration. SA Cagnoni is also a naval officer in the reserves. SA Cagnoni testified that Ms. Gabrielsen's being allowed to take the telephone call she was so worried about was not tied to her signing the consent to search form. While I note that Ms. Gabrielsen seemed to have a clearer recollection of the events (which may be only natural, given how traumatic they would have appeared to her), I make no finding that SA Cagnoni did not testify truthfully and honestly. Instead, I conclude that the government has not carried its burden and proven that Ms. Gabrielsen's consent was voluntary. Confronted with two equally plausible, but inconsistent, versions of the facts, and

two credible witnesses, I am unable to determine which is telling the truth. Since it is the government's burden to prove consent, my failure to find that Ms. Gabrielsen's consent was voluntary means that the search cannot be upheld on that ground.

There remains the government's argument that the evidence discovered in the search of Ms. Gabrielsen's apartment would have been discovered in any event because, if she had refused to sign the consent, SA Cagnoni would have obtained a search warrant. The evidence does support the government's contention that SA Cagnoni did have probable cause to obtain a warrant and that he would have done so. Based on that evidence, the government contends that the evidence is admissible under the inevitable discovery rule. *See Nix v. Williams*, 467 U.S. 431 (1984) (holding that evidence obtained from illegal interrogation need not be suppressed if it would have been inevitably discovered using lawful means).

The inevitable discovery rule does not apply in a situation like this where law enforcement officers conduct a search without obtaining valid consent, at least where there is evidence of coercion. If it did, there would be no need for law enforcement officers armed with probable cause ever to obtain a warrant. They could simply conduct the search without obtaining voluntary consent and then, when the search is later challenged in court on a motion to suppress, claim that they could have obtained a warrant. *United States v. Echegoyen*, 799 F.2d 1271, 1280 n. 7 (9th Cir.1986) ("[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment."); see also *United States v. Quinney*, 583 F.3d 891, 894-95 (6th Cir. 2009) (same). Although the Seventh Circuit has been more liberal than other circuits in applying the inevitable discovery doctrine, *see United States v. Alexander*, 573 F.3d 465, 477 (7th Cir. 2009);

9

*United States v. Tejada*, 524 F.3d 809, 812-13 (7th Cir. 2008), it has not applied that rule where as here there is evidence that involuntary consent was coerced.

Accordingly, and for the reasons set forth above, the motion to suppress evidence seized from Ms. Gabrielsen's apartment is granted.

**SO ORDERED** this   10th   day of September, 2012.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge